**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

John Doe,

      Plaintiff,                             Case No.  1:16cv987

      v.                                   Judge Michael R. Barrett

University of Cincinnati, *et al.*,

      Defendants.

### OPINION & ORDER

This matter is before the Court upon Plaintiff John Doe's Motion for Preliminary Injunction.  (Doc. 2).  Defendants filed a Response in Opposition (Doc. 11); and Plaintiff filed a Reply (Doc. 14).  Plaintiff also filed a Notice of Supplemental Authority.  (Doc. 15).  A hearing was held on November 21, 2016.

### I.    BACKGROUND

This case arises out of the decision of Defendants University of Cincinnati ("UC"), Aniesha Mitchell, Director of the Office of Student Conduct and Community Standards, and Juan Guardia, Assistant Vice President for Student Affairs and Dean of Students, to impose disciplinary sanctions on Plaintiff John Doe, a graduate student at UC.  (Doc. 1, ¶ 2).  Plaintiff is scheduled to graduate from his program with a Master's Degree in May of 2018.  (Id., ¶ 3).

According to the Complaint, Plaintiff met Jane Roe on Tinder, a social media app.  (Id., ¶ 46).  They spoke on line for two or three weeks until they met face to face.  (Id., ¶ 47).   On the evening of September 6, 2015, Jane Roe went to Plaintiff's apartment.  (Id.)  They started to kiss and make out.  (Id.)  Things escalated fairly

quickly. (Id.) They removed their clothing and Plaintiff retrieved a condom. (Id.) Jane Roe asked Plaintiff to "hold on" before they engaged in intercourse. (Id.) Plaintiff and Jane Roe talked for a bit, and then, according to Plaintiff, the two engaged in consensual sex. (Id.) After they had sex, they hung out in his room. (Id.) Jane Roe said that she did not want their encounter to be a "one-night stand." (Id. ¶ 47). However, Plaintiff did not call her again and was unable to contact her again through Tinder. (Id.)

On September 28, 2015, Jane Roe reported to UC's Title IX Office that she had been sexually assaulted by a fellow UC student. (Doc. 11-1, Karla Phillips Decl. at ¶ 2). On October 30, 2015, Jyl Shaffer, UC's Title IX Coordinator at that time, interviewed Jane Roe. (Id., ¶ 3). Jane Roe told Shaffer that the incident occurred on August 30, 2015. (Doc. 1, ¶ 50). Jane Roe stated that she met Plaintiff through Tinder and agreed to meet him for dinner. (Id.) Jane Roe explained that she had planned to study on campus after dinner, but Plaintiff suggested that she work at his apartment. (Id.) Jane Roe explained that she went to Plaintiff's apartment, sat on his bed to do work and had a glass of wine. (Id.) Jane Roe stated that the two talked and flirted and then began kissing. (Id.) Jane Roe explained that Plaintiff took her dress off, and "kept progressing," but she did not say no. (Id.) Jane Roe stated that the two engaged in oral sex and digital penetration, and after Plaintiff retrieved a condom, Plaintiff engaged in vaginal sex with her and tried to engage in anal sex. (Id.) Plaintiff explained that Plaintiff then walked her to her car. (Id.) Shaffer recorded these allegations, and five pages of her notes were included in the Title IX investigation file. (Phillips Decl. at ¶ 3).

On November 6, 2015, Shaffer interviewed Jane Roe again, and included an

additional five pages of her notes in the Title IX investigation file. (Id., ¶ 4). During this interview, Jane Roe told Shaffer that Plaintiff had been forceful with her. (Doc. 1, ¶ 51). Jane Roe explained that there was no explicit conversation about having sex. (Id.) Jane Roe explained that Plaintiff made her feel guilty, but that she never said, "Flat out, no. I don't owe you sex." (Id.) Instead, Jane Roe stated that she responded with statements such as, "I don't know." (Id.)

On December 18, 2015, Jane Roe reported the incident to the UC Police. (Id., ¶ 52). The investigation by the UC Police was reported to the Cincinnati Police Department and closed. (Id.)

On February 19, 2016, Remy Barnett, UC's Program Coordinator for the Title IX Office at that time, notified Plaintiff via email that a complaint of sexual assault had been filed against him by Jane Roe. (Phillips Decl., ¶ 6). Plaintiff initially did not remember Jane Roe, but he later acknowledged that he did remember her. (Id. at ¶ 8).

On February 24, 2016, Barnett interviewed Jane Roe as part of the investigation. (Id. at ¶ 9). Five pages of notes from that interview were included in the Title IX investigation file. (Id.)

On March 7, 2016, Barnett and Shaffer interviewed Plaintiff. (Id.) Plaintiff told Barnett and Shaffer that the sexual encounter with Jane Roe was completely consensual. (Doc. 1, ¶ 56). Barnett and Shaffer documented the interview, including seven pages of notes from the interview in the Title IX investigation file. (Phillips Decl., ¶ 10).

On March 15, 2016, Barnett followed up with Jane Roe to clarify a few of Jane Roe's prior statements. (Id., ¶ 9). The notes from that interview were also included in

the Title IX investigation file. (Id.)  Jane Roe explained that after Plaintiff retrieved a condom, she tried to "redirect" Plaintiff.  (Doc. 1, ¶ 57).

During the investigation, Jane Roe identified four persons with information about the incident.  (Phillips Decl., ¶ 10).  These four people included two of Jane Roe's friends, Jane Roe's roommate, and a former boyfriend of Jane Roe.  (Doc. 1, ¶ 58).  These four people were interviewed and the notes of those interviews were included in the Title IX investigation file.  (Phillips Decl., ¶ 10).  The information these four people provided was based on conversations they had with Jane Roe after the incident.  (Doc. 1, ¶ 58).

On April 1, 2016, Jane Roe emailed Barnett with "edits for the file."  (Id., ¶ 59).  A copy of that email was included in the Title IX investigation file.  (Phillips Decl., ¶ 10).

On April 15, 2016, a procedural review was conducted during which Plaintiff was given the opportunity to review the Student Code of Conduct, the incident report, and all other information available at that time.  (Doc. 11-2, Aniesha Mitchell Decl., ¶ 3).  The Student Code of Conduct includes the procedures to be used for hearings involving nonacademic misconduct.  (Doc. 1, Ex. A, at 25-31).  On April 18, 2016, Defendant Aniesha Mitchell gave Plaintiff online access to a copy of the Title IX investigation file. (Mitchell Decl., ¶ 4).

On June 27, 2016, UC conducted an Administrative Review Committee Hearing ("ARC Hearing").  (Id, ¶ 6).  Jane Roe was not present at the ARC Hearing.  (Id.) Plaintiff was not informed prior to the hearing that Jane Roe would not appear at the hearing.  (Doc. 1, ¶ 61).  The transcript of the ARC Hearing has been filed with the Court under seal.  (Doc. 16) (hereinafter "Tr.").

At the hearing, neither Plaintiff nor Jane Doe presented witnesses. (Tr. 5). While the ARC Hearing procedures permit the respondent and complainant to submit written questions to be asked to all adverse witnesses, no questions were submitted because there were no witnesses. (Tr. 6). A Title IX coordinator was not present. (Tr. 7). Instead, the Administrative Review Committee Chair ("ARC Chair") read a summary of the information contained in the Title IX investigation file. (Tr. 7). This information included the report made by Jane Doe, the response made by Plaintiff, and the statements of the four people Jane Doe identified as having information about the incident. (Tr. 8-25). The ARC Chair gave the ARC Committee the opportunity to ask questions regarding the report, but the Committee did not have any questions. (Tr. 29). The ARC Chair then explained:

> Okay, so the complainant is not here. At this time I would have given them [sic] time to ask questions of the Title IX report. But again, they [sic] are not here. So we'll move on.
>
> So now, do you, as the respondent, [REDACTED], have any questions of the Title IX report?
>
> [PLAINTIFF]: Well, since she's not here, I can't really ask anything of the report. Is this the time when I would enter in like a situation where like she said this and this never could have happened? Because that's just –
>
> [ARC CHAIR]: You'll have time here in just a little bit to direct those questions. Just --
>
> [PLAINTIFF]: Then no, I don't have any questions for the report.

(Tr. 29). The ARC Chair then explained that if there were no further questions, the Title IX presentation was concluded. (Tr. 30). The ARC Chair explained that if the complainant had been present she would have been able to read into the record what happened and add any additional information. (Tr. 30). The ARC Chair also explained

that Plaintiff would have had the chance to ask questions of the complainant.  (Tr. 30).
The ARC Chair then told Plaintiff he could summarize what happened and include any
additional supporting information to the investigation.   (Tr. 30).   Plaintiff made a
statement which acknowledged that he and Jane Roe had different perspectives on
what happened.  (Tr. 30-31).  Plaintiff disputed some of the specific facts from Jane
Roe's statement.  (Tr. 31).  Plaintiff concluded his statement with the following: "And I
would have asked her, I don't know if that can be entered in, at what point did she feel I
was hostile?  Because the beginning of the sexual encounter was very slow moving.  I
was feeling out, feeling out if she wanted to engage in that at all.  If she had, she would
had time to say no, to just stop me outright.  There was time."  (Tr. 32).

The ARC Committee then asked Plaintiff several questions.  (Tr. 32-35).  The
ARC Chair explained that if the complainant had been there, she also would have had
an opportunity to ask questions of Plaintiff.  (Tr. 35-36).  The ARC Chair then read a
statement from Jane Doe.  (Tr. 36-40).  The hearing concluded with a statement from
Plaintiff.  (Tr. 41).

The ARC Committee recommended that Plaintiff be found responsible for
violating the UC Student Code of Conduct. (Mitchell Decl., ¶ 9).  Daniel Cummins, the
Assistant Dean of Students, accepted the ARC Committee's recommendation and
imposed a two-year suspension on Plaintiff.  (Id., ¶ 10).  Plaintiff submitted an appeal,
and his sanction was reduced to a one-year suspension effective December 10, 2016.
(Id., ¶ 11).  As a result, Plaintiff is not eligible to re-enroll in UC until January 2, 2018.

Plaintiff seeks a preliminary injunction prohibiting Defendants from suspending
him in violation of his constitutional due process rights and rights under Title IX.

6

Plaintiff's Motion for Preliminary Injunction is focused solely on Defendants' failure to permit Plaintiff to confront his accuser.

## II.   ANALYSIS

### A.  Preliminary Injunction Standard

When deciding a motion for preliminary injunction under Federal Rule of Civil Procedure 65, this Court must consider: (1) whether there is a likelihood of success on the merits of the plaintiff's claim; (2) whether the plaintiff will suffer irreparable harm if the injunction is not granted; (3) whether others would be harmed by granting the injunction; and (4) whether the public good is served by issuing the injunction. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc)). These considerations are factors to be balanced, not prerequisites that must be met. *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001).

### B.  Likelihood of success on the merits

Plaintiff has brought a claim under 42 U.S.C. § 1983 based on a violation of procedural due process under the Fourteenth Amendment.

"To establish a procedural due process claim, a plaintiff must show that (1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (citing *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)). "Although property rights are principally created by state law, 'whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a

7

question of federal constitutional law.'" *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (quoting *Whaley v. County of Tuscola*, 58 F.3d 1111, 1114 (6th Cir.1995)).

This Court recently explained that "[a] student has a right to procedural due process in serious school disciplinary proceedings, like suspensions or expulsions." *Doe v. Ohio State Univ.*, No. 2:15-CV-2830, 2016 WL 6581843, at *7 (S.D. Ohio Nov. 7, 2016) (citing *Goss v. Lopez*, 419 U.S. 565, 576 (1975)); *see also Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) ("In this Circuit, we have held that the Due Process Clause is implicated by higher education disciplinary decisions."). In analyzing a procedural due process claim based on a school disciplinary proceeding, this Court has employed the three-factor analysis in *Mathews v. Eldridge*, 424 U.S. 319 (1976):

> The specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

2016 WL 6581843, at *7 (quoting *Mathews*, 424 U.S. at 334).

Plaintiff argues that he was never provided the opportunity to confront his accuser because Jane Roe did not testify at the ARC Hearing and the ARC Hearing Committee was only provided with summaries of Jane Roe's statements. Plaintiff maintains that these statements were required to be notarized pursuant to the Student Code of Conduct.

Plaintiff explains that if he had been permitted to cross-examine Jane Roe, he could have questioned her about inconsistencies in her statements and the accommodations Jane Roe likely received from UC, such as changes in homework

deadlines, grades, classes, schedules, and examination schedules or, in certain instances, job opportunities. Through such questioning, Plaintiff maintains that he could have demonstrated issues of credibility and that the accommodations provided to Jane Roe created a significant incentive for her to fabricate the allegation of sexual assault.

In response, Defendants point to this Court's recent statement that "there is no general due process right to cross examine witnesses in school disciplinary hearings." *Doe v. Univ. of Cincinnati*, No. 1:15- CV-681, 2016 WL 1161935, at *10 (S.D. Ohio Mar. 23, 2016). Defendants also rely on the Sixth Circuit decision in *Newsome v. Batavia Local School District*, 842 F.2d 920 (6th Cir. 1988), which held that "to require cross-examination . . . would unnecessarily formalize school expulsion proceedings, imposing the additional burden on school administrators of applying, to some extent, the rules of evidence." *Id.* at 925 n.4. However, in another recent decision, this Court clarified:

> The Due Process Clause generally does not guarantee the right to cross-examination in school disciplinary proceedings. *See Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 925-26 (6th Cir. 1988). But where a disciplinary proceeding depends on "a choice between believing an accuser and an accused . . . cross-examination is not only beneficial, but essential to due process." *Flaim*, 418 F.3d at 641 (holding that due process was not violated when cross-examination would have been a fruitless exercise, so this language is dictum).

*Doe v. Ohio State Univ.*, No. 2:15-CV-2830, 2016 WL 6581843, at *10 (S.D. Ohio Nov. 7, 2016).

During the preliminary injunction hearing, the Court questioned the parties as to whether there was a distinction to be made between secondary school disciplinary cases, such as *Newsome*, and disciplinary cases arising out of a university setting. The Court finds there is a distinction, as the Sixth Circuit's discussion in *Newsome v. Batavia* itself illustrates:

> The value of cross-examining student witnesses in school disciplinary cases, . . . is somewhat muted by the fact that the veracity of a student account of misconduct by another student is initially assessed by a school administrator—in this case, the school principal—who has, or has available to him, a particularized knowledge of the student's trustworthiness. The school administrator generally knows firsthand (or has access to school records which disclose) the accusing student's disciplinary history, which can serve as a valuable gauge in evaluating the believability of the student's account. Additionally, the school administrator often knows, or can readily discover, whether the student witness and the accused have had an amicable relationship in the past. Consequently, the process of cross-examining the student witness may often be merely duplicative of the evaluation process undertaken by the investigating school administrator.

*Newsome*, 842 F.2d at 924 (6th Cir. 1988); *see also Doe v. Ohio State University,* 2016 WL 6581843, at *7 (recognizing that "due process is a flexible concept and may require more or less process depending on the situation.") (citing *Flaim*, 418 F.3d at 641).

The Court notes that the total enrollment of UC during the 2016-2017 academic year is 44,338 undergraduate and graduate students. UC Facts, https://www.uc.edu/about/ucfactsheet.html (last visited Nov. 28, 2016). In a university setting, the administrators do not have the same "particularized knowledge" of a student's trustworthiness that exists in a high school with a smaller student population. Therefore, the value of cross-examination is not "somewhat muted" based on the school administrator's firsthand knowledge of the students involved. In this case, the ARC Hearing Committee was given the choice of believing either Jane Roe or Plaintiff, and therefore, cross-examination was essential to due process.

Defendants maintain that the UC disciplinary process does not prohibit cross-examination. Instead, parties are able to submit questions to the ARC Chair who may

in his or her discretion, ask those questions to the witnesses at the hearing.[1] Defendants explain that the reason cross-examination was unavailable in this case was because Jane Roe did not attend the disciplinary hearing. The Court acknowledges that in some cases, this format of cross-examination may not constitute a due process violation. However, in this case, Plaintiff was effectively denied the right to cross-examination because he was not notified in advance of the hearing that Jane Roe would not be present at the ARC Hearing. It was plain at the hearing that Plaintiff intended to ask certain questions, but because Jane Roe was not present at the hearing, he was not able to ask those questions. While this is not to say that UC's procedures must require the complainant to be present, at the very least, Plaintiff should have had the opportunity to submit written cross-examination questions to the ARC Chair in accordance with the Student Code of Conduct.

The Student Code of Conduct also requires that any statements of witnesses who are not present at the hearing be notarized: "Witnesses are strongly encouraged to be present for hearings. . . . However, if they are unable to attend, notarized statements may be submitted." (Doc. 1, Ex. A at 29). Likewise, the Student Code of Conduct requires the statements of the complainant or accused to be notarized: "If either party chooses not to attend the hearing, his or her notarized written statements shall be reviewed and evaluated based on the information available." (Doc. 1, Ex. A at 29). The Student Code of Conduct provides further that: "If the hearing chair elects to accept a witness's notarized written statement in lieu of in-person testimony, the identity of the

---

[1]The Student Code of Conduct provides: "The accused and the complainant shall have the right to submit evidence and written questions to be asked of all adverse witnesses who testify in the matter. The hearing chair, in consultation with the ARC, has the right to review and determine which written questions will be asked." (Doc. 1, Ex. A at 30).

witness and his or her statements shall be fully disclosed to the other party and they shall be given the opportunity to respond to such statements."  (Doc. 1, Ex. A at 29).

Defendants maintain that the written statements did not need to be notarized because Plaintiff received notice of the charges against him.  However, the two cases cited by Defendants—*C.Y. ex rel. Antone v. Lakeview Pub. Sch.*, 557 F. App'x 426, 432 (6th Cir. 2014) and *Paredes by Koppenhoefer v. Curtis*, 864 F.2d 426, 430 (6th Cir.1988)—only stand for the proposition that students must receive an explanation of the substance of the evidence against them.  These cases do not address whether a statement must be notarized in accordance with a school's own procedures.  The Court notes that "[s]ignificant and unfair departures from an institution's own procedures can amount to a violation of due process."  *Furey v. Temple Univ.*, 730 F. Supp. 2d 380, 396–97 (E.D. Pa. 2010) (citing *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir.1972)).

Based on the foregoing, the Court concludes that Plaintiff has adequately demonstrated that there is a likelihood of success on the merits of Plaintiff's due process claim.

### C. Irreparable harm

In order to establish irreparable harm, Plaintiff testified at the preliminary injunction hearing that the suspension would damage his academic and professional reputation, and due to the somewhat unique nature of his graduate program, the one-year suspension could affect his ability to pursue a career.

Defendants argue that courts have held that a suspension from school is not irreparable and the effect of the suspension on Plaintiff's reputation is speculative. However, the Court concludes that at the preliminary-injunction stage, Plaintiff has

12

shown through his testimony at the hearing that he will suffer irreparable injury without the benefit of an injunction during the pendency of these proceedings.

### D. **Harm to others**

Plaintiff argues that an injunction will not harm third parties or UC.  Plaintiff points out that he was permitted to remain on campus through the end of the Fall 2016 semester, which shows that UC is not concerned that he poses a risk to other students. The Court notes that there is no evidence in the record to the contrary.  Therefore, the Court concludes that, at the preliminary-injunction stage, Plaintiff has shown that the issuance of an injunction will not cause harm to others.

### E. **Public good**

Plaintiff argues that there is a broad public interest in enforcing fundamental constitutional principles.  Defendants respond that because UC is a public institution, it is in the public's interest to maintain the university's disciplinary system.  However, as the Court noted above, part of Plaintiff's claim is that UC failed to follow the procedures contained in its own disciplinary system.  Therefore, the Court concludes that, at the preliminary-injunction stage, Plaintiff has adequately shown that that the issuance of an injunction during the pendency of these proceedings is in the public interest.

III.    **CONCLUSION**

Based on the foregoing, Plaintiff John Doe's Motion for Preliminary Injunction. (Doc. 2) is **GRANTED**.  It is **ORDERED** that UC is enjoined from imposing on Plaintiff the one-year suspension which was to become effective December 10, 2016.  The Court sets a bond in the nominal amount of $1.

**IT IS SO ORDERED.**

_s/Michael R. Barrett_
JUDGE MICHAEL R. BARRETT
